**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

FEB **1 8** 2022

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

| | | |
|---|---|---|
| A.W and L.W.,<br>Individually<br>and as Parents of T.W.,<br><br>Plaintiffs<br><br>v.<br><br>PULASKI COUNTY SPECIAL<br>SCHOOL DISTRICT,<br><br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 4:22-CV-168-JM<br><br>This case assigned to District Judge Moody<br>and to Magistrate Judge Kearney |

---

## COMPLAINT

---

A.W. and L.W., Individually and as Parents and Next Friend of T.W., for their Complaint state:

### I. PARTIES

1.      T.W., age 10, is a child with a disability as defined by the

Individual with Disabilities Education Act ("IDEA"), 20 U.S.C.

§1401(3)(A)(i). T.W. has been diagnosed with Dyslexia and demonstrates a Specific Learning Disability ("SLD") in Reading. *See* 20 U.S.C. §1401(30) ("The term [SLD] . . . includes such conditions as . . . dyslexia . . ."). He has also been diagnosed with Attention-Deficit Hyperactivity Disorder, Combined Type. Finally, T.W. has been diagnosed with Adjustment Disorder with Depressed Mood.

2.      A.W. and L.W. are T.W.'s parents and will be collectively referred to as "Parents." *See* 20 U.S.C. §1401(23)(C) (definition of "parents").

3.      Plaintiffs are residents of Pulaski County, Arkansas, and T.W. attends school in the Pulaski County Special District ("PCSSD").

4.      PCSSD is an Arkansas school district and a public corporation that may be sued in its own name. *See* Ark. Code Ann. §6-13-102(a). Arkansas school districts are not state agencies immune from suit pursuant to the Eleventh Amendment. *See Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003).

## II.  SUMMARY OF CLAIMS

2

5.      Plaintiffs assert two claims. First, Parents seek to recover their

attorneys' fees and costs as the prevailing party in proceedings

under the IDEA. *See* 20 U.S.C. §1415(i)(3)(B)(i).

6.      Second, Parents and T.W. seek to recover compensatory

damages pursuant to §504 of the Rehabilitation Act of 1973, 29

U.S.C. §794(a) ("§504"), and Title II of the Americans' with

Disabilities Act, 42 U.S.C. §12131-12165 ("Title II") for disability

discrimination because PCSSD acted in bad faith by being

deliberately indifferent to T.W.'s rights under the IDEA.

### III.  JURISDICTION AND VENUE

7.      This Court has jurisdiction over Parents' IDEA fee claim

pursuant to 20 U.S.C. §1415(i)(3)(A).

8.      This Court has jurisdiction to award Parents and T.W.

compensatory damages for disability discrimination, including

retaliation, pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a), §504,

and/or Title II.

3

9.      This Court is the proper venue for Plaintiffs' claims. *See* 28

U.S.C. §1391(b). Plaintiffs reside in Pulaski County, Arkansas. PCSSD

is located in Pulaski County. The events giving rise to Plaintiffs'

Complaint occurred in Pulaski County. Pulaski County is in the

Eastern District of Arkansas, Central Division. *See* 28 U.S.C. §83(a)(1).

## IV. STATEMENT OF FACTS

10.     On February 26, 2021, Parents filed a due process complaint

with the Arkansas Department of Education ("ADE") alleging PCSSD

denied T.W. a free appropriate public education ("FAPE") in the

least-restrictive environment ("LRE") in violation of the IDEA.

11.     ADE numbered Parents' due process complaint as H-21-26 and

assigned the case to an impartial due process hearing officer ("HO").

12.     On March 29, 2021, Parents requested an Independent

Educational Evaluation ("IEE").

13.     On April 8, 2021, PCSSD filed a due process complaint against

Parents alleging its evaluation of T.W. was appropriate and asking

the HO to deny Parents' request for an IEE.

14.    ADE numbered PCSSD's due process complaint as H-21-31 and assigned the case to the same HO handling H-21-36.

15.    The parties agreed to consolidate H-21-26 and H-21-31 into a single due process hearing.

16.    The due process hearing lasted five days starting May 11, 2021 and ending July 14, 2021. The HO heard the testimony of 12 witnesses. Parents introduced 226 pages of exhibits. PCSSD introduced 266 pages of exhibits.

17.    On August 24, 2021, the HO issued her Final Decision and Order in H-21-26 and H-21-31 finding that PCSSD denied T.W. a FAPE from May 2020 to February 2021. The HO's decision (redacted) is attached hereto as **Exhibit A** and incorporated by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

18.    The HO found that PCSSD violated T.W.'s clearly established rights under the IDEA.

19.    First, the HO found PCSSD violated its "child find" obligation, 20 U.S.C. § 1412(a)(3). Specifically, school districts must ensure that:

All children with disabilities residing in the States, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).

20.    Child find extends to children who are suspected of having a disability and in need of special education, even though they are advancing from grade to grade. 34 C.F.R. §300.111(c)(1). Once a child is identified as potentially having a disability, the child's school district is required to conduct a full and individual evaluation to determine whether the child has a disability. The IDEA requires that initial evaluations and reevaluations meet certain requirements. 34 C.F.R. § 300.304. Specifically, a public agency must utilize a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child." *Id.* at § 300.304(b)(1). In addition, evaluations and reevaluations must assess all areas related to Student's suspected disability, "including, if

6

appropriate, health, vision, hearing, social and emotional status,

general intelligence, academic performance, communicative status,

and motor abilities. *Id.* at § 300.304 (c)(4).

21.    The HO concluded, "[PCSSD] did not fulfill its child find

obligations with regard to Student and, therefore, failed to timely

evaluate Student." **Ex. A, p. 21**. The HO found that T.W. "should

have been referred for evaluation no later than the end of his

second-grade year" because "his assessments all consistently

showed a deficit of one to two grade levels in reading and math."

**Ex. A, p. 23**.

22.    While T.W.'s right to an evaluation was clearly established by

the end of second grade, PCSSD departed substantially from

accepted professional standards and chose to pursue a course of

action knowing it would likely result in a violation of T.W.'s rights

under the IDEA.

23.    As a result of PCSSD's failure to evaluate T.W. and determine

his educational needs, T.W.'s academic failure continued during third

7

grade causing T.W. and Parents emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life. PCSSD's testing showed T.W.'s percentile ranks were falling, and he was in the first percentile in both language usage and math. *See* **Ex. A, p. 23**.

24.    At the due process hearing, PCSSD's witnesses alleged that T.W. made consistent progress in kindergarten through third grade so there was no need to refer him for evaluation. *See* **Ex. A, p. 25**. The HO flatly rejected the testimony of PCSSD's witnesses:

District may have been winning some battles, but overall it was losing the war. Student continued to fall further and further behind despite the interventions being provided. At the point that District realized its efforts were not effectively closing the gap for Student, i.e. moving Student toward grade level in reading, a special education referral was required.

**Ex. A, p. 25**.

25.    Based on PCSSD's unreasonable delay in evaluating T.W., the HO found PCSSD denied T.W. a FAPE from May of 2020 (end of second grade) to February 18, 2021, when the PCSSD finally held a referral conference and initiated a full and individual initial evaluation of T.W. **Ex. A, p. 28**.

**26.**   The HO found PCSSD's evaluation of T.W. was

appropriate and denied Parents' request for an IEE. **Ex. A, p.**

**30**.

**27.**   The HO ordered PCSSD to take the following actions for

T.W.:

(1) By or before October 1, 2021, District shall reimburse
Parents in the amount of $2,590 for costs associated with hiring
Nancy Steenburgen to provide dyslexia tutoring to Student in
the summer of 2020.

(2) Between the date of this decision and May 1, 2022, District
shall provide to Student, as compensatory education, a total of
24 hours of dyslexia intervention. These intervention hours
shall be above and beyond any services being provided to
Student in his current IEP. This award of compensatory
education accounts for approximately one hour of dyslexia
intervention per week, for a period of six months. This
calculation is based on the fact that Student should have been
referred for evaluation in May 2020, approximately nine
months prior to his February 2021 referral. Considering
timelines for referral meetings and evaluations, it is estimated
that Student was deprived of services for approximately six
months.

**Ex. A, p. 31**.

## V.  CLAIMS

<u>COUNT I</u>

### IDEA ATTORNEYS' FEES AND COSTS

28.     Parents are the prevailing party in a proceeding under the IDEA and may be awarded reasonable attorneys' fees and costs. *See* 20 U.S.C. §1415(i)(3)(B)(i).

29.     The HO's decision awarded Parents actual relief on the merits of their claim that materially altered the legal relationship between the parties by modifying PCSSD's behavior in a way that directly benefited T.W. *See Birmingham v. Omaha Sch. Dist.*, 298 F.3d 731, 734 (8th Cir. 2002).

30.     PCSSD had 90 days to appeal the HO's decision. *See* 20 U.S.C. §1415(i)(2)(B) (90 days to appeal). PCSSD's time to appeal ran on November 22, 2021. PCSSD did not file an appeal, and as a result, the HO's decision is now a final judgment for purposes of the doctrines of the law of the case, issue preclusion, and claim preclusion.

31.     The IDEA does not establish a limitations period for an IDEA fee claim. *See* 20 U.S.C. §1415(i)(3). The Eighth Circuit

has established a 90-day limitations period that starts when the losing party's time to appeal runs out, or 180 days from the HO's decision. *See Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 875-76 (8th Cir. 2020), cert. denied, 141 S. Ct. 2851 (2021); 20 U.S.C. §1415(i)(2)(B) (90 days to appeal). February 20, 2022 is 180 days from the HO's decision. Accordingly, Parents' IDEA fee claim is timely.

32.    Parents will submit a properly supported motion for summary judgment on their IDEA fee claim consistent with the Court's scheduling order.

### COUNT II
### §504/TITLE II DISABILITY DISCRIMINATION

33.    The enforcement, remedies, and rights are the same under §504 and Title II. *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir.2000).

34.    T.W. is a qualified individual with a disability.

35.    PCSSD is a public entity receiving federal funds.

36.    PCSSD discriminated against T.W. solely on the basis of his

disability.

37.    PCSSD harmed Parents and T.W. by departing so substantially from accepted professional judgment, practice or standards as to demonstrate that the PCSSD acted with wrongful intent and in bad faith.

38.    PCSSD's decision to pursue a course of action knowing it would likely result in a violation of T.W.'s right to an evaluation under the IDEA creates an inference that PCSSD acted with deliberate indifference. *See Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

39.    This Court must give the HO's decision the same preclusive effect that it would be entitled to in Arkansas courts because the HO was acting in a judicial capacity, the questions litigated were properly before the HO, and the parties had an adequate opportunity to litigate them. *See Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986); *Plough v. West Des Moines Community School Dist.*, 70 F.3d 512, 515–16 (8th Cir.1995).

40.     ADE's rules establish that the HO acted in a judicial capacity. For example, the rules define "hearing officer" as "an impartial, trained individual assigned by [ADE], Special Education Unit, for the purpose of presiding at a due process hearing or expedited due process hearing." ADE Spec. Ed. Rules §10.01.21.1. *See* 20 U.S.C. §1415(f)(3)(a) (minimum qualifications for hearing officers). The rules ultimately require hearing officers to produce a "written judgment" including "findings of fact," and "the decision(s)" and "orders resulting from the hearing decision." ADE Spec. Ed. Rules, §10.01.39.2. *See* 20 U.S.C. §1415(h)(4) (requiring written findings of fact and decisions). Therefore, the HO clearly acted in a judicial capacity.

41.     ADE rules also make clear that the questions litigated were properly before the HO. The rules grant hearing officers authority:

[T]o rule on any matter that pertains to the identification, evaluation or educational placement of a child with a disability,

and the provision of a free appropriate public education to the
child within the meaning of the IDEA and Ark. Code Ann.
6-41-202, *et seq.*

ADE Spec. Ed. Rules §10.01.22.1. Notably, PCSSD did not challenge to

the HO's jurisdiction. The HO's decision outlines the questions litigated,

and those questions clearly fall within the HO's broad jurisdiction to ensure

IDEA compliance. **Exhibit A, pp. 1-2**. Therefore, there can be no dispute

that the questions litigated were properly before the HO.

42.    Finally, the parties had an adequate opportunity to litigate the

questions presented. ADE's rules guaranteed the parties were

afforded due process. They provide:

Any party to a hearing under these procedures has the right to
–

A. Be accompanied and advised by counsel and by individuals
with special knowledge or training with respect to the
problems of
children with disabilities;

B. Present evidence and confront, cross-examine, and compel
the attendance of witnesses;

C. Prohibit the introduction of any evidence at the hearing that
has not been disclosed to that party at least five (5) business
days before the hearing;

D. Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; and

E. Obtain written, or, at the option of the parents, electronic findings of fact and decisions.

ADE Spec. Ed. Rules 10.01.14.1. At the hearings, the HO allowed PCSSD

to present all the evidence it wanted, to call all the witnesses it wanted, to

cross-examine Parents' witnesses, and to submit a post-hearing brief

before the HO ruled. Moreover, the HO placed the burden proof on

Parents. **Exhibit A, p. 3**. Consequently, there can be no doubt that PCSSD

had an adequate opportunity to litigate the questions presented.

43.    Therefore, this Court must give the HO's decision the same

preclusive effect that a state court would. In Arkansas, an unreviewed

administrative decision may be given preclusive effect in later

proceedings. *Alexander v. Pathfinder, Inc.*, 91 F.3d 59, 62 (8th Cir.

1996) (citing *Pine Bluff Warehouse v. Berry*, 51 Ark.App. 139, 142,

912 S.W.2d 11, 13 (1995)). "In Arkansas, issue preclusion bars

relitigation of an issue of law or fact that was litigated in the first suit

when the issue sought to be precluded is the same as that involved

in the prior litigation, was actually litigated, determined by a valid

and final judgment, and its determination was essential to the

judgment." *Id.* (citing *Crockett & Brown, P.A. v. Wilson*, 314 Ark. 578,

581, 864 S.W.2d 244, 246 (1993)).

44.    Applying Arkansas law, issue preclusion bars PCSSD from

relitigating whether it denied T.W. a FAPE from May 2020 to

February 18, 2021. That issue was actually litigated before the HO.

PCSSD did not appeal the HO's decision, and as a result, it is now a

final judgment. *Alexander*, 91 F.3d at 62 ("Under Arkansas law, an

unappealed administrative decision is a final judgment.") (citing *Pine

Bluff Warehouse v. Berry*, 51 Ark.App. 139, 142, 912 S.W.2d 11, 13

(1995)). Finally, the HO's finding that PCSSD denied T.W. a FAPE was

essential to the judgment. Accordingly, issue preclusion applies, and

PCSSD cannot relitigate whether it denied T.W. a FAPE from May

2020 to February 18, 2021.

45.    The Court may reach the same result applying the law of the

case doctrine. "'[A] decision in a prior appeal is followed in later

proceedings unless a party introduces substantially different

evidence, or the prior decision is clearly erroneous and works a

manifest injustice.'" *United States v. Bartsh*, 69 F.3d 864, 866 (8th

Cir.1995) (quoting *United States v. Callaway*, 972 F.2d 904, 905 (8th

Cir.1992) (per curiam)). PCSSD cannot establish that the HO's

decision was clearly erroneous or that application of the law of the

case doctrine would work a manifest injustice. When PCSSD decided

not to appeal the HO's decision, it was conceding that it denied T.W.

a FAPE from May 2020 to February 18, 2021. Therefore, the law of

the case doctrine also bars PCSSD from relitigating that issue.

46.     Parents, individually, are "person[s] aggrieved" and have

standing to pursue a §504/Title II discrimination claim based on

the PCSSD's disability discrimination against T.W. described herein.

*See* 29 U.S.C. §794a(a)(2) ("The remedies, procedures, and

rights . . . shall be available to any person aggrieved by any act or

failure to act by any recipient of Federal assistance or Federal

provider of such assistance . . . "); 42 U.S.C. § 12133 (incorporating

§794a); *K.F. v. Francis Howell R-III Sch. Dist.*, No. 4:07CV01691 ERW, 2008 WL 723751, at *7 (E.D. Mo. Mar. 17, 2008) ("This Court is persuaded by the reasoning in *Blanchard* and *C.J.G.*, and finds that parents do have standing under Section 504 and the ADA as an aggrieved party in their own right.") (following *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934 (9th Cir. 2007) and *C.J.G. v. Scranton Sch. Dist.*, 2007 WL 4269816 at *5-6 (M.D. Pa. Dec. 3, 2007)).

47.    As a direct and proximate result of the PCSSD's bad faith/ deliberate indifference, Parents and T.W. have incurred and will incur in the future pecuniary and non-pecuniary losses for which they should be compensated.

48.    Parents and T.W. have incurred pecuniary losses in the form of past and future medical expenses and lost wages.

49.    Parents and T.W. have suffered non-pecuniary losses in the form of past and future emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

50.   Parents respectfully requests compensatory damages for

Parents' and T.W.'s pecuniary and non-pecuniary losses in an

amount determined by a jury.

## VI.  JURY DEMAND

51.   Plaintiffs demand a jury trial on Count II.

WHEREFORE, Plaintiffs pray that Parents be awarded their attorneys'

fees and costs and the prevailing party in proceedings under the IDEA;

that Parents and T.W. be awarded compensatory damages from PCSSD for

disability discrimination in an amount determined by a jury; and, that

Plaintiffs be awarded all other just and proper relief to which they may be

entitled.


Respectfully submitted,

Theresa L. Caldwell
Arkansas Bar Number 91163
Attorney for Plaintiffs

**CALDWELL LAW OFFICE**
14 Alban Lane
Little Rock, Arkansas 72223

Tel.: 501-414-0434
E-mail: theresa@specedattorney.com

ARKANSAS DEPARTMENT OF EDUCATION
Special Education Unit

IN RE:

XXXXXXXXXXXXXXX,                                                     PETITIONERS
Parents on behalf of
XXXXXXXXXXX, Student

VS.                            CASE NOS.    ADE H-21-26
                                            ADE H-21-31


PULASKI COUNTY SPECIAL SCHOOL DISTRICT                    RESPONDENT


HEARING OFFICER'S FINAL DECISION AND ORDER

ISSUES PRESENTED:

A.      Whether, as alleged in ADE H-21-26, the Pulaski County Special School District

        (hereinafter "District" or "Respondent") denied XXXXXXXXX (hereinafter "Student")

        a free, appropriate, public education (hereinafter "FAPE") between February 26,

        2019 and February 26, 2021, in violation of certain procedural and substantive

        requirements of the Individuals with Disabilities in Education Act of 2004, 20 U.S.C.

        §§ 1400-1485, as amended (hereinafter "IDEA"), by: (1) failing to refer Student for a

        comprehensive educational evaluation and, as a result, conduct necessary

        evaluations so as to determine whether Student was eligible for special education

        programming; (2) failing to provide appropriate District personnel at a referral

        conference on February 18, 2021; and (3) failing to provide Parents a meaningful

ADE H-21-26
ADE H-21-31

1



opportunity to participate in the decision-making process regarding Student's educational placement and program.[1]

B.      Whether, as alleged in ADE H-21-31, District's March 2021 evaluation of Student was appropriate and, thus, justified District's refusal to pay for Student to be independently evaluated, as requested by Parents on March 29, 2021.[2]

**PROCEDURAL HISTORY:**

On February 26, 2021, the Arkansas Department of Education (hereinafter "Department") received a written request from Parents to initiate due process hearing procedures on behalf of Student (ADE H-21-26). Parents requested a due process hearing because they believed that District failed to comply with the IDEA by failing to refer Student for special education consideration, failing to evaluate Student for the purpose of determining whether Student has a disability in need of special education programming, failing to provide appropriate District personnel at a referral conference that was held on February 18, 2021, and failing to provide Parents with a meaningful opportunity to participate in the decision-making process regarding Student's educational placement and programming.[3] On April 8, 2021, District filed a due process complaint against Parents, pursuant to ADE Regulations 9.03.2.2-2.4, asserting that Parents were not entitled to an independent educational evaluation (hereinafter "IEE"), as requested on March 29, 2021, because District's March 2021 evaluation of Student was appropriate (ADE H-21-31).[4]

---

[1] *See* Due Process Complaint in ADE H-21-26.
[2] *See* Due Process Complaint in ADE H-21-31.
[3] *See* Due Process Complaint in ADE H-21-26.
[4] *See* Due Process Complaint in ADE H-21-31.

ADE H-21-26
ADE H-21-31

In response to Parents' and District's requests for hearing, the Department assigned ADE H-21-26 and ADE H-21-31 to an impartial hearing officer.  These cases, although separate due process filings, were ultimately consolidated at the request of the parties. Thereafter, May 11, 2021 was set as the date on which a hearing would commence if the Parents and District failed to reach resolution prior to that time.  On May 6, 2021, a prehearing conference regarding this matter was conducted, via telephone.  Counsel for both parties participated in the hearing.  During the prehearing conference, the parties discussed unresolved issues to be litigated at the hearing of this matter, as well as the witnesses and evidence necessary to address these issues.  On May 11, 2021, the closed hearing of this matter commenced.  Testimony was heard on May 11, 2021, May 12, 2021, May 26, 2021, July 13, 2021, and July 14, 2021.[5]  All testimony was heard either in person at the Little Rock School District Administrative Offices or via telephone. The hearing concluded on July 14, 2021.

The following witnesses testified in this matter: Staisey Hodge, Nancy Steenburgen, Melissa Hannah, Samantha Overton Shattuck, Bridget Lewis, Amber Harwell, Shiranir Engle, Priscilla Martinez, Marcia Harding, Rebecca McCormick, and Parents (both).[6]  Parents had the burden of proof regarding the issues raised in this case.

Having been given jurisdiction and authority to conduct the hearing pursuant to Public Law 108-446, as amended, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Danna J. Young, J.D., Hearing Officer for the Arkansas Department of Education,

---

[5] *See* Hearing Transcript for Consolidated ADE H-21-26 and ADE H-21-31 (hereinafter "Hearing Transcript"), Vols. I-V.
[6] *Id.*

ADE H-21-26
ADE H-21-31

3

conducted a closed impartial hearing.  Parents were represented by Theresa Caldwell (Little Rock, Arkansas), and the District was represented by Jay Bequette (Little Rock, Arkansas). Both parties were offered the opportunity to provide post-hearing briefs, and both timely submitted briefs for consideration.

## FINDINGS OF FACT:

Student is a ten-year-old male (DOB 11/23/2011) who is enrolled in the Pulaski County Special School District.  Between February 26, 2019 and February 26, 2021, the time period statutorily covered in this action, Student attended first through third grade at Clinton Elementary School in Sherwood, Arkansas. As of this decision. Student has been diagnosed with a specific learning disability in the areas of reading and math, as well as , Attention Deficit Hyperactivity Disorder (hereinafter "ADHD").[7]

**First Grade (2018-2019 School Year).** In February 2019, when Student was in the first grade, he began receiving interventions via the response to interventions process (hereinafter "RTI") at District. District held an initial meeting on February 7, 2019 to discuss Student's needs, as well as recommended interventions.[8] Documentation in the record indicates that six classroom teachers, a math coach, a literacy coach, and a reading specialist were present in the meeting.[9]  Neither of Student's parents were present during the February 7, 2019 meeting; however, Parents provided consent on March 27, 2019 for Student to receive speech screening.

---

[7] District Exhibits, p. 255.
[8] *Id.* at pp. 12-20.
[9] *Id.*

ADE H-21-26<br>
ADE H-21-31

The RTI documentation from the February 7, 2019 RTI committee meeting stated that reading was an area of concern for Student.[10] Two reading assessments were referenced in support of this assertion, specifically a STAR reading test that indicated that Student was reading at a mid-kindergarten level (GE 0.5) and a Developmental Reading Assessment (hereinafter "DRA") that indicated the same (DRA Level 4).[11] It was noted that Student had been struggling in reading "[a]ll year," and that Parents had inquired about Student's reading in January 2019 after noting that Student's report card showed deficits in this area.[12] The RTI documentation indicated that Student would receive Lexia lessons and guided reading with emphasis in phonics four days per week, for a duration of fifteen minutes per day.[13]

District began providing interventions to Student on February 4, 2019.[14] District's intervention notes indicate that between February 4, 2019 and April 24, 2019, Student worked on sight words and phonics fundamentals.[15] Progress monitoring assessments administered to Student between February 4, 2019 and the end of Student's first-grade year showed that Student continued to struggle in the area of reading. Specifically, Student was administered a STAR reading assessment on February 13, 2019, March 5, 2019, and April 16, 2019, and Student's scores indicated that he was reading at a grade equivalent of 0.0, 0.0, and 0.4, respectively.[16] These scores represented a range between beginning kindergarten and mid-kindergarten (0.4 is equivalent to kindergarten, fourth month). Student's score on

---

[10] *Id.* at p. 15.
[11] *Id. See also* Parent Exhibits, p. 44 for a conversion chart that discusses various reading assessments and the grade levels represented by their scoring levels.
[12] District Exhibits, p. 15.
[13] *Id.* at p. 17.
[14] *Id.* at p. 44.
[15] *Id.* at pp. 44-55.
[16] *Id.* at p. 30.

his April 16, 2019 assessment placed Student in the fifth percentile in reading.[17] Student was also administered the STAR early literacy test on February 12, 2019, March 4, 2019, and April 15, 2019.[18] Student's lexile measures as determined by these assessments were BR460L, BR450L, and BR335L, respectively, all indicating that Student was reading on a pre-kindergarten level.[19] Although math was not listed as an area of concern for Student, District assessed Student's math progress around the same timeframe that it assessed his reading levels. Specifically, Student was administered the STAR math assessment on February 14, 2019, March 5. 2019, and April 17, 2019.[20] Student's scores on these assessments indicated that Student was performing in the area of math at a grade equivalent of 1.5, >1, and 1.1, respectively, indicating a decline in performance throughout the spring 2019 semester.[21] Student also worked in a reading program called Lexia. Student's Lexia level as of March 13, 2019 was Core 5, Level 6, which is equivalent to beginning first-grade skills.[22]

Student's report card for the third nine weeks, dated February 11, 2019 and representing the same timeframe that Student was beginning interventions, indicates that Student had met standards on 0 of 4 phonics objectives, 2 of 3 reading comprehension objectives, 0 of 1 writing objectives, 0 of 1 handwriting objectives, 2 of 4 operations and algebraic thinking objectives, and 1 of 3 number and operations in base ten objectives.[23] Student's report card for the fourth nine weeks, dated April 24, 2019, indicates that Student

_____

[17] Parent Exhibits, p. 48.
[18] District Exhibits, p. 31.
[19] *Id. See also* Parent Exhibits, p. 44.
[20] District Exhibits, p. 32.
[21] *Id.*
[22] *Id.* at p. 6.
[23] *Id.* at p. 184.

had met standards on 1 of 5 phonics objectives, 2 of 3 reading comprehension objectives, 0 of 1 writing objectives, 3 of 4 operations and algebraic thinking objectives,  3 of 3 number and operations in base ten objectives, and 1 of 2 measurement and data objectives.[24]

Student's teacher testified that Student had made progress in reading as a result of small group and reading interventions.[25] She testified that Student, although beginning the school year at DRA Level 4, was at a DRA Level 12 by the end of the 2018-2019 school year as a result of the interventions that he had received.[26]

**Second Grade (2019-2020 School Year).** During the 2019-2020 school year, Student's second-grade year, District continued providing RTI to Student.[27] Between September 3, 2019, and the start of the COVID-19 shutdown in March 2020, Student received regular interventions that focused on phonics principles, compound words, rhyming words, reversible letters, word blends, and reading comprehension.[28] On January 21, 2020, District completed a form entitled "RTI Reading Concern" and administered a Level 1 Dyslexia Screener to Student, although it appears that District did not vary the interventions that it was providing to Student following same. Beginning March 16, 2020, interventions decreased on account of COVID-19.[29]

Parents became more aware of Student's deficits between March 17, 2020 and the end of Student's second-grade school year. Because of the global pandemic, Parents were

---

[24] *Id.* at p. 183.
[25] Hearing Transcript, Vol. III, p. 64.
[26] *Id.*
[27] District Exhibits, pp. 33-38.
[28] *Id.*
[29] *Id.* at p. 63.

ADE H-21-26
ADE H-21-31

working 1:1 with Student at home to complete homework packets. Parents testified that it was very apparent that Student was not reading well.[30]

Progress monitoring assessments administered to Student during the 2019-2020 school year indicated that Student continued to struggle academically in the area of reading. Student was administered a total of seven STAR reading tests during his second-grade year, with grade equivalent levels ranging between 0.0 (kindergarten,  beginning) and 0.7 (kindergarten, seventh month).[31] District documentation indicated that Student's STAR reading level at the end of his second-grade year was 0.8, which is the grade equivalent of kindergarten, eighth month.[32] Throughout second grade, Student was scoring between the 1st and 4th percentiles based on his performance on STAR reading assessments.[33] In addition, Student was administered six STAR math assessments during his second-grade year.[34] Student's levels on these assessments ranged from a grade equivalent of 1.0 (first grade, beginning) to a grade equivalent of 1.7 (first grade, seventh month).[35] Student's percentile rank on STAR math assessments ranged from below the first  and the 20th percentile.[36] Student also continued to work in Lexia during the 2019-2020 school year. Student's Lexia progress as of December 11, 2019 indicated that Student was working on

---

[30] Hearing Transcript, Vol. IV, pp. 192, 194-95
[31] Parent Exhibits, p. 49.
[32] *Id.* at p. 47.
[33] *Id.* at p. 49.
[34] *Id.*
[35] *Id.*
[36] *Id.*

Core 5, Level 7, which represents beginning to mid-level first grade skills.[37] By April 15, 2020, Student had progressed to Core 5, Level 9, which represents end-of-year first-grade skills.[38]

Student's teacher testified that Student was making progress as a result of the interventions that he was receiving. She explained that the standardized tests that Student was given did not represent his abilities because Student did not always finish the tests.[39]

**Third Grade (2020-2021 School Year).** During the summer 2020, prior to Student's third-grade year, Parents contacted and hired a private reading tutor, Nancy Steenburgen (hereinafter "Steenburgen"), to work with Student.[40] Steenburgen worked with Student using the Barton Program from July 2020 through April 2021. Parents paid Steenburgen $2590 during this period of time for tutoring services.[41] After conducting a few sessions with Student, Steenburgen recommended that Student be formally evaluated for Dyslexia. Parents took Steenburgen's advice and scheduled Student to be evaluated by Families First. Because of COVID-19, Student was unable to undergo evaluation until December 2020.[42] In the interim, Parents communicated to Student's third-grade teacher that Student was struggling to read, that he had a private reading tutor, that he was scheduled for an evaluation in December 2020, and that they felt that the District's reading interventions were not helping Student to the extent necessary.[43]

---

[37] District Exhibits, p. 7.
[38] *Id.* at p. 9.
[39] Hearing Transcript, Vol. III, p. 12.
[40] Hearing Transcript, Vol. IV, pp. 193-95.
[41] Parent Exhibits, p. 194.
[42] Hearing Transcript, Vol. IV, p. 196.
[43] *Id.* at p. 197.

ADE H-21-26
ADE H-21-31

9

District documentation indicated that Student's DRA level as of September 1, 2020 was 12, which is a level that represents the grade equivalent of first grade.[44] Similarly, testimony established that Student's Lexia level upon entering third grade was equivalent to a first grader.[45] Student participated in NWEA Map testing on October 1, 2021 (reading), October 2, 2021 (mathematics), and October 8, 2021 (language usage).[46] In reading, Student's score was 157, placing Student at the 4th percentile as compared to his same-age peers.[47] The District grade level mean was 186.3.[48] It was noted that Student was "in need of support" and that Student needed to focus in the area of vocabulary acquisition.[49] Student's score report also included a Flesch-Kincaid Grade Level of 0.5 to 0.2, indicating that Student tested at the beginning to mid-kindergarten level in reading.[50] In language usage, Student's score was 158, placing Student at the 3rd percentile as compared to his same-age peers.[51] The District grade level mean for language usage was 184.8.[52] Suggested areas of focus included understanding language and editing mechanics.[53] In mathematics, Student's score was 166, placing Student at the 5th percentile as compared to his same-age peers.[54] The District grade level mean for mathematics was 185.2.[55] It was noted that Student was "in need of support" in mathematics, and that the focus area for Student should be number and

---

[44] Parent Exhibits, pp. 47, 44.
[45] Hearing Transcript, Vol. IV, p. 11.
[46] District Exhibits, pp. 127-136.
[47] *Id.* at p. 130.
[48] *Id.* at pp. 130, 84.
[49] *Id.* at p. 130.
[50] *Id.*
[51] *Id.* at p. 132.
[52] *Id.* at p. 85.
[53] *Id.* at p. 132.
[54] *Id.* at p. 128.
[55] *Id.* at p. 83.

ADE H-21-26
ADE H-21-31

operations.[56] Student received a D for both reading and language arts for the first quarter of the 2020-2021 school year.[57] Student continued to also work in Lexia during the 2020-2021 school year. Student's Lexia progress as of October 3, 2020 indicated that Student was working on Core 5, Level 10, which represents beginning of year second-grade skills.[58]

On October 15, 2020, District sent a letter to Parents requesting consent for level 2 dyslexia screening for Student.[59] Parents gave consent for the requested screener on October 17, 2020.[60] It appears from the record, however, that Student was not immediately administered a level 2 dyslexia screener.

In December 2020, Parents took Student to Arkansas Families First and had him evaluated by a licensed psychologist, Dr. Mary Ekdahl, Ph.D. As part of this evaluation, Student was administered the following assessments: (1) Wechsler Intelligence Scale for Children - Fifth Edition (hereinafter "WISC"); (2) Wechsler Individual Achievement Test - Fourth Edition (hereinafter "WIAT"); (3) Comprehensive Test of Phonological Processing (hereinafter "CTOPP"); (4) Beery-Buktenica Developmental Test of Visual Motor Integration - Sixth Edition; (5) Conners Rating Scales - Third Edition; and (6) Behavior Assessment System for Children - Third Edition (hereinafter "BASC").[61]

With regard to the WISC, Student performed within the average to high average range for most tests of reasoning ability.[62] Student struggled with tests of working memory and

---

[56] *Id.* at p. 128.
[57] Parent Exhibits, p. 47.
[58] District Exhibits, pp. 9, 11.
[59] *Id.* at p. 90.
[60] *Id.* at p. 92.
[61] Parent Exhibits, pp. 33-40.
[62] *Id.* at pp. 34-35.

ADE H-21-26
ADE H-21-31

11

visual processing speed, which indicated to Dr. Ekdahl that Student may have issues efficiently processing information.[63] Student's composite score on this assessment was in the average range.[64]

With regard to the WIAT, Student tested in the low average range for receptive vocabulary and the average range for expressive vocabulary.[65] Student's reading skills were also well below the expected range for his age and grade.[66] Dr. Ekdahl further noted that Student struggled significantly with spelling skills, which directly affected his written expression.[67] She explained that Student struggled specifically with "proper letter formation, including frequent letter reversals. . . but consistently used appropriate end punctuation, and he used words meaningfully."[68] Regarding mathematics, Student struggled with demonstrating math concepts and fluent memorization of math facts.[69] Dr. Ekdahl summarized that Student was "struggling in most areas of academic achievement," with his skills falling in the first or second grade range overall.[70] Results were similar for the CTOPP, with Student scoring below average in the areas of phonological awareness and rapid naming, and poor in the area of phonological memory.[71]

With regard to the Conners Rating Scales, Parents and District teachers submitted ratings that indicated problems with inattention, hyperactivity, and peer relations.[72]

---

[63] *Id.*
[64] *Id.*
[65] *Id.* at pp. 36-37.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.* at p. 37.
[72] *Id.* at p. 38.

ADE H-21-26
ADE H-21-31

Similarly, the results of the BASC indicate that Student's teachers had significant concern regarding learning problems, possible concern regarding disruptive behavior, attention problems, social withdrawal, and possible depression.[73]

Dr. Ekdahl summarized that Student's evaluation results were consistent with Attention Deficit Hyperactivity Disorder (hereinafter ADHD), as well as a specific learning disability in reading.[74] She specifically stated the following: "Although scores are lower than expected in other areas of academic achievement, it is suspected that [Student's] struggles with reading and attention deficits are making learning difficult across most areas of the curriculum."[75] She further stated that Student would benefit from additional supports in school, recommending more intensive academic intervention to address dyslexia "and/or individualized instruction via an IEP."[76] Dr. Ekdahl further recommended that Student be given the following academic accommodations: (1) test items read aloud; (2) opportunity for Student to give oral, rather than written, responses; (3) extended time for tests; (4) testing in an individual setting to decrease distractions; (5) allow for directions and test items to be read aloud; (6) opportunities to use audiobooks for regular classroom instruction; (7) reduced workload; and (8) extended time for certain assignments.[77] Finally, Dr. Ekdahl recommended that Student be encouraged to participate in extracurricular activities at school to address social and emotional adjustment concerns, and also that Parents take

---

[73] *Id.*
[74] *Id.* at pp. 39, 40.
[75] *Id.* at p. 39.
[76] *Id.*
[77] *Id.*

ADE H-21-26
ADE H-21-31

13

Student to his primary physician to determine if Student needed medication to address symptoms of ADHD.[78]

In January 2021, Student again participated in NWEA Map testing. Specifically, Student tested on January 21, 2021 (reading), January 22, 2021 (mathematics), and January 28, 2021 (language usage).[79] In reading, Student's score increased from 157 to 166, however, Student's percentile dropped to the 3rd percentile as compared to his same-age peers.[80] The District grade level mean increased from 186.3 to 190.7.[81] In language usage, Student's score increased from 158 to 164, but Student's percentile rank fell from the 3rd percentile to the 1st percentile as compared to his same-age peers.[82] The District grade level mean for language usage increased from 184.8 to 189.[83] In mathematics, Student's score increased from 166 to 167, but Student's percentile rank fell from the 5th percentile to the 1st percentile as compared to his same-age peers.[84] The District grade level mean for mathematics increased from 185.2 to 190.1.[85] By January 25, 2021, Student's Lexia level was Core 5, Level 11, which represents mid-year second-grade skills.[86]

On January 25, 2021, Parents notified District that they had received the results of Dr. Ekdahl's evaluation and wanted to schedule a conference to discuss the evaluation report.[87] Parents and District agreed to meet on February 12, 2021 to review Dr. Ekdahl's

---

[78] *Id.*
[79] Parent Exhibits, p. 49.
[80] *Id.*
[81] District Exhibits, p. 87.
[82] Parent Exhibits, p. 49.
[83] District Exhibits, p. 88.
[84] Parent Exhibits, p. 49.
[85] District Exhibits, p. 86.
[86] *Id.* at pp. 10-11.
[87] *Id.* at p. 224; *See also* Hearing Transcript, Vol. IV, pp. 213-14.

ADE H-21-26<br>ADE H-21-31

evaluation.[88] On February 9, 2021, Parents sent to District, via email, a copy of Dr. Ekdahl's evaluation report and, two days later, District sent a meeting link to Parents to discuss the report and diagnoses contained within.[89] On February 12, 2021, the day of the scheduled meeting to discuss Dr. Ekdahl's evaluation report, Parents and District corresponded about the purpose of the meeting. Parents expressed that they were expecting a referral conference, and District responded that it had not understood that and would need to set a separate conference date. Ultimately, Parents and District decided on February 18, 2021 for Student's referral conference.[90]

The record contains a special education referral form dated February 12, 2021.[91] District listed on this form that Student's strengths included "growth in reading," as measured on "MAP Growth . . . at the 42nd percentile."[92] This reference is to percentage of growth, as opposed to Student's norm referenced percentile rank on the NWEA map test.[93] The referral document also stated that Student had made progress in dyslexia intervention, noting that he had grown in the Sonday Program from level 10 in October 2020, to level 15 in February 2021.[94] It was noted that District's reading specialist had been working with Student on "applying phonics skills with grade level words involving 2 and 3 syllables, and splitting words into syllables."[95]

---

[88] District Exhibits, p. 86.
[89] Id.
[90] Id. at p. 225.
[91] Parent Exhibits, p. 15.
[92] Id.
[93] Id.
[94] Id.
[95] Id.

ADE H-21-26
ADE H-21-31

On February 18, 2021, and again on February 23, 2021, Parents met with referral committee members to discuss Dr. Ekdahl's evaluation. Parents discussed concerns about Student's lack of progress and also the fact that Student was being pulled from valuable class time to receive interventions. District discussed the option of changing Student's intervention time to 5 days a week, 35 minutes per day.[96] The referral committee determined that Student needed to be further evaluated, although a full evaluation was not required, and that a temporary IEP was not necessary.[97] Regarding additional evaluations, the referral committee determined that Student needed hearing/vision screening, observations in math/reading, word discrimination tests, a second achievement test, a second IQ test, and a social history.[98] The referral committee rejected Parent's request for a temporary IEP pending evaluation of Student because it was of the opinion that more immediate intervention was not necessary in light of that being provided to Student as of February 23, 2021.[99] Referral committee members present at these conferences included, but were not limited to, Parents, Student's third-grade teacher, a special education teacher, the assistant principal and LEA, District's school psychology specialist, a dyslexia interventionist, a reading specialist, and an advocate for Parents.[100] On February 25, 2021, Parents provided consent for Student to be further evaluated.[101]

---

[96] *Id.* at p. 24.
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.* at p. 20.
[101] *Id.* at p. 25.

ADE H-21-26
ADE H-21-31

16

District completed a form entitled "Characteristic Profile of Dyslexia for Arkansas Public Schools" on February 18, 2021. This form was completed using data from Dr. Ekdahl's evaluation report, and was subsequently reviewed by District's Dyslexia Specialist.[102] District determined that Student's scores indicated that he had characteristics of dyslexia and recommended that Student continue receiving dyslexia interventions with frequent progress monitoring.[103] On March 2, 2021, March 4, 2021, and March 8, 2021, Student was further evaluated by District.[104] District conducted a social and educational history and classroom observations, as well as conducted the following assessments: (1) Reynolds Intellectual Assessment Scales - Second Edition (hereinafter referred to as "RIAS-2"); (2) Woodcock-Johnson IV Tests of Achievement (hereinafter referred to as "WJ-IV"); and (3) Test of Auditory Processing Skills - Third Edition (hereinafter referred to as "TAPS-3").[105]

Regarding the RIAS-2, Student's nonverbal intelligence index and composite intelligence index were in the average range.[106]Regarding the WJ-IV, which assessed Student in areas of reading, math, and written expression, Student's scores were all below or well below average.[107] Specifically, Student's performance was below average on the following subtests: letter-word identification, passage comprehension, sentence reading fluency, applied problems in math, and writing samples.[108] Student's performance was documented as well below average with regard to math calculation.[109] Regarding the TAPS-3, Student's

---

[102] *Id.* at p. 46.
[103] *Id.*
[104] District Exhibit, pp. 245-52.
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*

auditory processing skills were determined to be in the average range.[110] District's evaluation indicated that Student should be considered for special education services and that the team could consider the categories of other health impairment and specific learning disability as the basis for this decision.[111]

On March 29, 2021, District held an IEP meeting and Parents attended.[112] At this meeting, Parents requested an IEE, asserting that District had failed to conduct a comprehensive language screener.[113] District rejected Parents' request for an IEE and, on April 8, 2021, filed a due process complaint, ADE H-21-31, seeking a finding that its March 2021 evaluation was appropriate.

District staff testified that Student finished his third-grade year with a DRA Level of 24, and a Lexia level equivalent to an early third grader; however, the record does not appear to contain documentary evidence of these scores.

## CONCLUSIONS OF LAW AND DISCUSSION:

Pursuant to Part B of the IDEA, states are required to provide a FAPE for all children with disabilities between the ages of three and twenty-one. 20 U.S.C. § 1412(a); 34 C.F.R. §300.300(a). In 1982, in *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, the United States Supreme Court addressed the meaning of FAPE and set forth a two-part analysis that must be made by courts and hearing officers in determining whether a school district has failed to

---

[110] *Id.*

[111] *Id.*

[112] Please note that the substance of this IEP meeting, as well as the IEP that resulted therefrom, fall outside of the statutory time period covered in ADE H-21-26. For this reason, details about this meeting are irrelevant. The March 29, 2021 meeting is only mentioned here to provide a complete timeline leading to District's April 8, 2021 due process complaint in ADE H-21-31.

[113] Hearing Transcript, Vol. II, pp. 151-53.

ADE H-21-26
ADE H-21-31

18

provide FAPE as required by federal law. 458 U.S. 176, 206-07 (1982); *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 804 (8th Cir. 2011). The first inquiry that a court or hearing officer must make is that of whether the State, *i.e.* local educational agency or district, has complied with the procedures set forth in the IDEA. *Id.* Thereafter, it must be determined whether the student's education was reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Id.*; *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, No. 15-827*, 2017 WL 1066260, 580 U.S. ___ (2017), 137 S.Ct. 988 (2017).

It is noted that, even though testimony for ADE H-21-26 and ADE H-21-31 was consolidated, there are two distinct cases to consider. For clarity, ADE H-21-26 (Parents' allegation that District violated FAPE with regard to Student) and ADE H-21-31 (District's allegation that most-recent evaluation was appropriate) are addressed separately below.

**ADE H-21-26**
**Alleged Denial of FAPE between February 26, 2019 and February 26, 2021**

1. ***Procedural Violations of FAPE***

It must first be determined whether District complied with the procedures set forth in the IDEA. Parents alleged in ADE H-21-26 that District failed to refer Student for a comprehensive educational evaluation, failed to conduct necessary evaluations so as to determine whether Student was eligible for special education programming pursuant to the IDEA, failed to provide appropriate District personnel at a referral conference on February 18, 2021, and failed to provide Parents a meaningful opportunity to participate in the

decision-making process regarding Student's educational placement and program.[114]  All of these issues are procedural in nature and will be addressed herein.

**<u>Child Find: Failure to Refer and Failure to Evaluate.</u>**  In the present case, Parent alleged that District failed to refer Student for special education testing and consideration and, as a result, failed to conduct necessary evaluations for the purpose of determining whether Student was eligible for special education services. Although Parents did not specifically reference a "child find" violation, that is the essence of their allegation. Some circuits have expressly stated that child find and failure to evaluate claims are procedural in nature and, therefore, must be analyzed prior to determining whether there was a substantive violation of the IDEA. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249-250 (3d Cir. 2012); *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010); *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).

Congress enacted the IDEA for the purpose of ensuring that all children with disabilities have access to a "free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). In order to ensure that all children with disabilities receive a FAPE, school districts are required to satisfy a "child find" obligation. 20 U.S.C. § 1412(a)(3). Specifically, districts must ensure that:

> All children with disabilities residing in the States, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).

---

[114] *See* Due Process Complaint in ADE H-21-26.

ADE H-21-26

ADE H-21-31

Child find extends to children who are suspected of having a disability and in need of special education, even though they are advancing from grade to grade. 34 C.F.R. §300.111(c)(1). Once a child is identified as potentially having a disability, the child's school district is required to conduct a full and individual evaluation to determine whether the child has a disability.  The IDEA requires that initial evaluations and reevaluations meet certain requirements.  34 C.F.R. § 300.304.  Specifically, a public agency must utilize a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child." *Id.* at § 300.304(b)(1).   In addition, evaluations and reevaluations must assess all areas related to Student's suspected disability, "including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.  *Id.* at § 300.304 (c)(4).

In the present case, it is the opinion of this Hearing Officer that District did not fulfill its child find obligations with regard to Student and, therefore, failed to timely evaluate Student.

During the 2018-2019 school year, Student's first-grade year, Student began receiving reading interventions in February 2019. By the end of first grade, Student's STAR reading scores indicated that he was reading on a mid-kindergarten level, or essentially one- and one-half grade levels behind his peers. Other progress measures utilized by District, however, indicated that Student was operating at a first-grade level. Specifically, Student's DRA scores indicated that he was reading at Level 12, which equated to Student reading at approximately a first-grade level. In addition, Student's Lexia level at the end of first grade indicated that he was progressing through program exercises that were geared for first-

ADE H-21-26
ADE H-21-31

21

grade students. Considering these progress assessments comprehensively, it makes sense that District did not refer Student for evaluation and special education consideration at the end of Student's first-grade year. Two out of three measures indicated that Student was on or close to grade level, resulting in the STAR reading assessment scores appearing to be outliers.

Although District was justified in not referring Student for evaluation in first grade, that justification faded during Student's second-grade year, specifically the 2019-2020 school year. Student continued to struggle academically, and this, coupled with the extent of his academic deficits, should have triggered District to evaluate Student for the purpose of determining special education eligibility. Specifically, Student was administered at least seven STAR reading tests during his second-grade year, and the highest score that Student achieved on any of these assessments, representing Student's score at the end of second grade, indicated that Student was reading at a 0.8 grade level, which equates to kindergarten, eighth month. Essentially, as Student was preparing to move into third grade, his STAR reading scores indicated that he was reading more than two grade levels behind his same-age peers, placing him at the first percentile in reading.  Similarly, Student's Lexia level at the end of second grade indicated that Student was working on exercises that required the skill level of an individual at the end of first grade. Thus, Student's Lexia level indicated that he was at least one grade level behind his same-age peers in the academic area of reading. Finally, Student was administered STAR math assessments as well, six in total. Student's scores, at their highest, represented a grade equivalent of 1.7, indicating skills commensurate with a student in the seventh month of first grade. This means that in the

academic area of mathematics, Student was more than a grade level behind his same-age peers as he entered the third grade.

The key difference between Student's assessment scores in second grade as opposed to his scores a year earlier, is the consistency among various progress measurements utilized by District. At the end of Student's second-grade year, his assessments all consistently showed a deficit of one to two grade levels in reading and math. At a minimum, Student should have been referred for evaluation no later than the end of his second-grade year.

Similarly, during the 2020-2021 school year, Student's third-grade year, Student's continued academic deficits should have led District to refer Student for evaluation and determination of special education eligibility. Student began third grade at the same DRA Level, specifically Level 12, that he had achieved at the end of first grade. Essentially, Student's DRA level did not improve at all during his second-grade year, and Student was approximately two grade levels behind his same-age peers based on this assessment score. In addition, Student's fall NWEA Map testing indicated that Student was performing in reading at a mid-kindergarten level, representing more than two grade levels behind his same-age peers. Student's language usage and mathematics NWEA Map scores were similarly low. All of Student's scores on the NWEA Map assessment given in October 2020 fell between the third and fifth percentile. Three months later, when Student was administered the winter NWEA Map testing in the same academic areas, Student's percentile ranks in every area had decreased, with Student falling to the first percentile in both language usage and mathematics. Student's Lexia level at the middle of third grade indicated that Student was performing on a mid-year second-grade level, essentially one full grade

ADE H-21-26
ADE H-21-31

23

level behind his same-age peers. Dr. Ekdahl's evaluation also stated that Student was performing academically at a first or second grade level. Despite all of District's attempts to intervene and assist Student, he was remaining at least one grade level or more behind his same-age peers in reading and mathematics. At a minimum, had District not been triggered to refer and evaluate Student prior to this time, Student's assessment scores throughout the fall and winter of the 2020-2021 school year should have caused District to be suspicious as to whether Student had a disability that was interfering with his ability to perform academically.

District argued in its post-hearing brief that Student's STAR reading scores should not be relied on for the purpose of determining Student's reading level. Specifically, District argued that Student should not have been administered any STAR reading assessments until he had reached a certain threshold score on the STAR early literacy assessments. The reality, however, is that District chose to give these assessments to Student. In addition, Student was given numerous STAR reading assessments between February 26, 2019 and February 26, 2021, the statutory period covered in this case. If District's counsel is correct regarding the applicability of STAR reading assessments, then it raises the question as to why District would repeatedly give Student an assessment that was not appropriate for the purpose of measuring reading progress. In addition, District's argument does not take into consideration the fact that Student's STAR reading assessments were not viewed in isolation. There were other progress measures being utilized by District between February 26, 2019 and February 26, 2021. During Student's second and third grade year, there was consistency among these various assessments.

ADE H-21-26<br>ADE H-21-31

24

District further argues that Student was making consistent progress as a result of the regular interventions that Student received in the first, second, and third grades. There was testimony by many different witnesses as to the progress of Student. Most stated that there was no need to refer Student for evaluation and a determination of special education eligibility because he was progressing. While RTI is a key component of intervening early, it is not a replacement for special education services. With regard to Student, the small amounts of progress noted by District were not making any strides toward the ultimate goal of getting Student to read on grade level. District may have been winning some battles, but overall it was losing the war. Student continued to fall further and further behind despite the interventions being provided. At the point that District realized its efforts were not effectively closing the gap for Student, i.e. moving Student toward grade level in reading, a special education referral was required.

**Personnel at February 18, 2021 Referral Conference.** Parents allege in their due process complaint that District held a referral conference on February 18, 2021, without all required persons at the meeting. ADE regulations pertaining to special education referrals require that at least three persons be present at a referral conference. ADE 4.04.2. One of these individuals must be the principal or a designee, and another must be a teacher directly involved in the education of Student. *Id.* Documentation in the record established that there were many more District staff members at the February 18, 2021 referral conference than required by regulation. In addition, the assistant principal, as well as Student's third-grade teacher were present, satisfying the requirements set forth in ADE 4.04.2. As a result, it is the

ADE H-21-26
ADE H-21-31

25

opinion of this Hearing Officer that District did not procedurally violate the IDEA as a result of its staffing choices at the February 18, 2021 referral conference conducted for Student.

**Parental Participation.**  The IDEA requires that the parents of a child with a disability either be present at each IEP meeting or be afforded the opportunity to participate. *Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 427 (8th Cir. 2010).  Furthermore, a school district can neither refuse to consider parents' concerns when drafting an IEP, nor predetermine the educational program for a disabled student prior to meeting with parents. *Schaffer v. Weast*, 546 U.S. 49, 53 (2005).  Such predetermination could deprive parents of a meaningful opportunity to participate in the formulation process pertaining to the IEP. *Gray*, 611 F.3d at 424 (citation omitted). "The IDEA explicitly requires school district to include parents in the team that drafts the IEP to consider 'the concerns of the parents for enhancing the education of their child' and to address 'information about the child provided to, or by, the parents.'" *M.M. ex. rel. L.M. v. Dist. 0001 Lancaster County Sch.*, 702 F.3d 479 (8th Cir. 2012). Certainly, a school district's obligation under the IDEA regarding parental participation in the development of a student's IEP "should not be trivialized." *Rowley*, 458 U.S. at 205-06.

In *Rowley*, the Court stated that "[i]t seems . . . no exaggeration to say that Congress placed every bit as much emphasis on compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Id.*  It should be noted, however, that by requiring parental participation, the IDEA in no way requires a school district to accede to parents' demands without considering suitable

alternatives. A district does not procedurally violate the IDEA simply by failing to grant a parent's request.

In the present case, Parents allege in their due process complaint, ADE H-21-26, that District prevented them from meaningfully participating in Student's education. The allegation in their complaint is vague, and Parents did not present sufficient evidence in the hearing of this matter to establish their claim. As such, it is the opinion of this Hearing Officer that Parents failed to meet their burden with regard to this allegation.

**Conclusion.** It is the opinion of this Hearing Officer that District procedurally violated the IDEA by failing to meet its child find obligations regarding Student. There is no violation on account of Parents' assertions pertaining to inappropriate staffing at the February 18, 2021 referral conference or parental participation.

### 2. *Substantive Violations of FAPE*

Having analyzed the first prong of the FAPE analysis, specifically that of procedural violations, and determined that District failed to engage in child find activities and timely evaluate Student, it is now necessary to consider whether the District's actions resulted in a substantive denial of a FAPE to Student. Prior to March 22, 2017, Eighth Circuit law provided that if a student received "slight" or "de minimis" progress, then he or she was not denied educational benefit. *K.E. ex rel. K.E.*, 647 F.3d at 810; *Paris Sch. Dist. v. A.H.*, 2017 WL 1234151 (W.D. Ark 2017). On March 22, 2017, however, the United States Supreme Court "rejected the 'merely more than *de minimis*' standard that had previously been the law of the Eighth Circuit." *Paris Sch. Dist.*, 2017 WL at 4 (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, No. 15-827*, 2017 WL 1066260, 580 U.S. ___ (2017)).

ADE H-21-26
ADE H-21-31

27

In *Endrew F.*, the standard set forth by the Court is "markedly more demanding" as compared to the "merely *de minimis*" test outlined in *Rowley. Endrew F.*, 2017 WL 1066260, at *1000.  The Court stated the following:

> It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot.  When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time when they were old enough to "drop out."

*Endrew F.*, 2017 WL 1066260, at *1001 (citations omitted). The Court held that the IDEA requires, even demands, more.  Specifically, the IDEA requires that students under the Act be provided with an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

In the present case, it is the opinion of this Hearing Officer that District's failure to identify Student by the end of the 2019-2020 school year (second grade) and initiate an evaluation resulted in a substantive denial of a FAPE.  Between May 2020, the time period representing the end of Student's second grade year, and February 18, 2021, the date that District held a special education referral conference and initiated a comprehensive evaluation, Student lost approximately six to nine months of special education services.  As such, it is the opinion of this Hearing Officer that District's procedural failure to meet its child find obligations resulted in a substantive violation of FAPE for Student.

ADE H-21-26
ADE H-21-31

28

<u>**ADE H-21-31**</u>
<u>**Appropriateness of Student's Most-Recent Evaluation and Denial of IEE**</u>

In March 2021, District conducted an evaluation of Student pursuant to a referral conference that took place on February 18, 2021 and February 23, 2021.  Parents alleged that District's evaluation was incomplete and requested an IEE. District rejected this request and, thereafter, filed a due process complaint on April 8, 2021, specifically ADE H-21-31, seeking a ruling that its evaluation of Student was appropriate.

Regarding evaluations, District is required to use a variety of assessment tools and strategies for the purpose of gathering relevant information as to Student's functional, developmental, and academic status. 34 C.F.R. §300.304(b)(2021). District is not permitted to use a single measure or assessment as the sole criterion for determining whether Student constitutes a child with a disability or to determine appropriate educational programming for Student. *Id.* Further, District is required to assess Student in all areas related to any suspected disability, "including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. *Id.* at §300.304(c)(4). The Arkansas Department of Education sets forth required areas for evaluation for situations in which a specific learning disability is suspected. These evaluation requirements include the following assessments: social history, individual intelligence, individual achievement, adaptive behavior, communicative abilities, visual perception, auditory perception, and observation. In addition, at least one assessment must be given for each of the following deficit areas, as determined by intellectual and achievement testing: oral expression, listening comprehension, written expression, basic

reading skills, reading fluency skills, reading comprehension, mathematics calculation, or mathematics problem solving.

In the present case, Dr. Ekdahl evaluated Student in December 2020, and District did a specialized evaluation of Student in March 2021. The purpose of District's evaluation in March 2021 was to build on Dr. Ekdahl's previous testing so that it had the equivalent of a comprehensive evaluation for purposes of determining special education eligibility. The evidence in this case establishes that all required areas were addressed between Dr. Ekdahl's evaluation and the follow-up evaluation conducted by District. In fact, Parents requested an IEE on a single basis, specifically that District had not assessed Student in the area of communicative abilities. The evidence in this case suggests otherwise. Here, Student was evaluated in the areas of expressive and receptive language, and Student's scores indicated that he was in the average range for both. Student's communication skills, therefore, required no additional testing. As such, it is the opinion of this Hearing Officer that District's evaluation of Student was appropriate, and its rejection of Parents' request for an IEE was justified.

**Conclusion.**   With regard to ADE H-21-26, it is the opinion of this Hearing Officer that District procedurally violated the IDEA with regard to its child find obligations, and that such violation constituted a substantive violation of FAPE between May 2020 and February 2021. With regard to ADE H-21-31, it is the opinion of this Hearing Officer that District appropriately evaluated Student in March 2021 and, therefore, was justified in rejecting Parents' request for an IEE pertaining to Student's communicative abilities.

ADE H-21-26
ADE H-21-31

30

## ORDER:

The results of the testimony and evidence warrant a finding for Parents in ADE H-21-26, and a finding for District in ADE H-21-31. With regard to ADE H-21-26, Parents introduced sufficient evidence in the record to establish by a preponderance of the evidence that District denied Student FAPE between May 2020 and February 2021 by failing to comply with its child find obligations and comprehensively evaluate Student to determine special education eligibility. As such, District is hereby ordered to take the following actions regarding Student:

(1) By or before October 1, 2021, District shall reimburse Parents in the amount of $2590 for costs associated with hiring Nancy Steenburgen to provide dyslexia tutoring to Student in the summer of 2020.

(2) Between the date of this decision and May 1, 2022, District shall provide to Student, as compensatory education, a total of 24 hours of dyslexia intervention. These intervention hours shall be above and beyond any services being provided to Student in his current IEP. This award of compensatory education accounts for approximately one hour of dyslexia intervention per week, for a period of six months. This calculation is based on the fact that Student should have been referred for evaluation in May 2020, approximately nine months prior to his February 2021 referral. Considering timelines for referral meetings and evaluations, it is estimated that Student was deprived of services for approximately six months.

ADE H-21-26
ADE H-21-31

31

It is also noted that any non-IDEA claims made in Parents' due process complaint, such as claims brought pursuant to Section 504 of the Rehabilitation Act, are hereby dismissed without prejudice, as this Hearing Officer only has jurisdiction to adjudicate claims brought pursuant to the IDEA. Any and all other outstanding motions, to the extent that there are any, are hereby deemed moot.

## FINALITY OF ORDER AND RIGHT TO APPEAL:

The decision of this Hearing Officer is final.  A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Section 10.01.36.5, *Special Education and Related Services: Procedural Requirements and Program Standards,* Arkansas Department of Education 2008, the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

/s/ Danna J. Young
_____
**HEARING OFFICER**

08/24/2021
_____
**DATE**

ADE H-21-26
ADE H-21-31

32